United States District Court
Southern District of Texas
**ENTERED**
February 06, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| RONNIE COLEMAN, §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>CHEVRON PHILLIPS CHEMICAL §<br>COMPANY LP, §<br>§<br>Defendant. §<br>§ | CIVIL ACTION NO. H-23-350 |

**MEMORANDUM AND OPINION**

The plaintiff, Ronnie Coleman, alleges that his former employer, the defendant Chevron Phillips Chemical Company LP ("CPChem"), discriminated against him based on race (African American) and age (57 when hired). Summary judgment is appropriate because Coleman has failed to raise a genuine issue of fact material to determining whether CPChem discriminated against him.

**I.    Background**

In 2019, CPChem hired Coleman to work as a process operator in its Pasadena plastics complex. In January 2021, Coleman successfully bid for an opening at the "Plant 6" unit in the Pasadena plastics complex. (Docket Entry No. 19-1 at 69). He was assigned to begin a training plan on the outside reactor that would run from January 2021 to July 2021. (*Id.*). Coleman had to complete training modules and written examinations before proceeding to an area walkthrough, a critical part of his training. (*Id.* at 69–70).

In April 2021, Coleman asked to take a break from reactor training in order to do loadout training.  (*Id.*).  His request was granted.  (*Id.*).  This made him eligible for overtime shifts in the loadout area.  (*Id.*).

In May 2021, Coleman returned to reactor training and took his 60-day evaluation.  (*Id.* at 85).  He was rated as "Needs Improvement" in four out of five areas and was given specific suggestions to improve.  (*Id.* at 85–86).  Coleman contested his rating, blaming it on, among other things, the Texas February 2021 freeze for delaying his training, causing certain absences, and leading to harassment by his training supervisor, Wayne Kline.  (*Id.*).  HR investigated the harassment allegation, but no one had seen or heard Kline treat Coleman inappropriately or differently from other trainees.  (Docket Entry No. 19-2 at 12).

In August 2021, Coleman finished the last training module, leaving the required walkthrough, which tested necessary knowledge of the training material.  (*Id.* at 58).  Kline and Marlon Jordan (an African American Chief Daylight Operator) did Coleman's walkthrough with him.  (*Id.* at 28; Docket Entry No. 19-1 at 70).  They both determined that Coleman did not pass.  (Docket Entry No. 19-1 at 70).

Coleman met with Operations Manager Robert Ricker to complain about Kline, alleging that he was making racially inappropriate remarks and not giving proper training.  Coleman asked for a shift change.  (*Id.* at 23).  Because of Coleman's complaints against him, Kline did not participate in the rest of Coleman's evaluation.  (*Id.* at 70).  Coleman also complained about a lack of assistance from the plant superintendent, Nicole Wright, in getting his training.  (Docket Entry No. 19-1 at 27).

After Coleman failed his first walkthrough attempt, a second occurred in September 2021.  (Docket Entry No. 19-1 at 70).  Howard Williams, who is older than Coleman and also African

American, conducted the walkthrough with Coleman and concluded that Coleman had not passed. (*Id.*).  It was then decided that Coleman would get a third attempt, set far enough ahead to allow Coleman extra shifts to prepare.  (*Id.*).  The third walkthrough fared no better.  Coleman had trouble identifying equipment, giving correct process flows, and demonstrating an overall understanding of the reactor process.  (Docket Entry No. 19-2 at 44–45).  The next day, Coleman asked for a fourth walkthrough attempt, which occurred a month later.  (*Id.* at 47).  Williams found that Coleman had not passed, noting that he was not at the "expected knowledge level."  (*Id.* at 54). He was terminated shortly thereafter.  (*Id.* at 56–58).  This lawsuit followed.

Coleman's claims are that: (1) he was deprived of training, subjected to additional testing, and ultimately terminated based on his race in violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. § 2000e *et seq.*; (2) he was deprived of training, subjected to additional testing, and ultimately terminated based on his age in violation of the Age Discrimination in Employment Act of 1967, § 2 *et seq.*, 29 U.S.C. § 621 *et seq.*; and (3) he was terminated because the defendants wanted to avoid paying him medical benefits for his gout, in violation of the Employee Retirement Income Security Act of 1974, § 2 *et seq.*, 29 U.S.C. § 1001 *et seq.*

CPChem has moved for summary judgment.  (Docket Entry No. 19).  Coleman has responded, CPChem has replied, and Coleman has sur-replied.  (Docket Entry Nos. 22, 23, 25). CPChem has also moved to strike portions of the affidavits attached to Coleman's response brief. (Docket Entry No. 24)  Based on the pleadings, the briefing, the record, and the applicable law, the court concludes that Coleman has identified no factual dispute material to determining whether CPChem discriminated against him or terminated him for the purpose of denying him ERISA

benefits.  CPChem's motion to strike is granted in part and its motion for summary judgment is granted in full.  The reasons are set out below.

## II.      The Legal Standards

### A.      Rule 56

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial." *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted).  "However[,] the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).  "If 'reasonable minds could differ' on 'the import of the evidence,' a court

must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted).  The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted).  Of course, all reasonable inferences are drawn in the nonmovant's favor.  *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022).  But a nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

## B.    Summary Judgment Evidence and the Sham Affidavit Doctrine

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).

The sham affidavit doctrine prevents a party from defeating a motion for summary judgment "using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Walmart*, 30 F.4th 472, 477 (5th Cir. 2022) (quoting reference omitted).  "[A] nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Id.*  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.*  "When a summary-judgment affidavit is subsequently executed after a prior sworn statement is made, and

there is a clear contradiction on a material point without explanation, the 'sham affidavit' doctrine

is applied and the contradictory statements in the affidavit should be disregarded." *Tafacory v.*

*Deutsche Bank Nat'l Tr. Co.*, 2020 WL 7658070, at *6 (E.D. Tex. Nov. 6, 2020), *report and*

*recommendation adopted sub nom. Tafacory v. Deutsche Bank Nat'l Tr. Co. as Tr. for Registered*

*Holders of Long Beach Mortgage Loan Tr. 2006-6, Asset-backed Certificates, Series 2006-6*, 2021

WL 958544 (E.D. Tex. Mar. 15, 2021), *aff'd*, 2021 WL 6061556 (5th Cir. Dec. 17, 2021).

When a plaintiff fails to recall specific details at his deposition that he later includes in a

summary judgment affidavit, the sham affidavit doctrine applies. *See Doe ex rel. Doe v. Dallas*

*Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (collecting authority); *Yeager v. Bowlin*, 693

F.3d 1076, 1080 (9th Cir. 2012) ("[A] district court may find a declaration to be a sham when it

contains facts that the affiant previously testified he could not remember").

## C.     Title VII Discrimination

A *prima facie* case of discrimination under Title VII requires the plaintiff to show that he:

"(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged

or suffered some adverse employment action by the employer; and (4) was replaced by someone

outside his protected group or was treated less favorably than other similarly situated employees

outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007),

*abrogated on other grounds by Hamilton v. Dallas Cnty*, 79 F.4th 494 (5th Cir. 2023) (en banc).

When a plaintiff relies on circumstantial evidence to prove discrimination, the *McDonnell*

*Douglas*[1] framework applies. *Id.* Under the first step of *McDonnell Douglas*, the plaintiff must

establish a *prima facie* case of discrimination. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th

Cir. 2015) (quoting reference and quotation marks omitted). If the plaintiff establishes a *prima*

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*facie* case, the burden shifts to the employer to state a legitimate, non-discriminatory reason for its decision. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020). If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's reason is actually a pretext for discrimination. *Id.* "This burden is satisfied by introducing evidence which, if true, would permit the trier-of-fact to conclude that the termination was nondiscriminatory." *Id.* at 306 (quoting reference omitted).

### D.      The Age Discrimination in Employment Act

The Age Discrimination in Employment Act makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (citations, quotation marks, and quoting references omitted) (alterations adopted). Ultimately, the plaintiff must prove that age was the "but-for" cause of the challenged employer decision. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

As with a Title VII claim, when a plaintiff relies on circumstantial evidence to prove age discrimination, the *McDonnell Douglas* framework applies. *Id.* First, the plaintiff must establish a *prima facie* case of age discrimination: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii)

otherwise discharged because of his age." *Goudeau v. Nat'l Oilwell Varco, LP*, 793 F.3d 470, 474 (5th Cir. 2015).  If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must raise an issue of fact as to whether the proffered reason is "false or unworthy of credence."  *Id.*  "A showing that the unsuccessful employee was clearly better qualified (as opposed to merely better or as qualified) than the employees who are selected will be sufficient to prove that the employer's proffered reasons are pretextual."  *Id.* (quotation marks and quoting reference omitted).

### E.    The Employee Retirement Income Security Act

The Employee Retirement Income Security Act "protect[s] employees' justified expectations of receiving the benefits their employers promise them."  *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).  "ERISA . . . seek[s] to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits . . . When Congress enacted ERISA, it wanted to make sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it."  *Id.* (quotation marks and quoting reference omitted, alterations adopted).  "ERISA does not guarantee substantive benefits.  The statute, instead, seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures."  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320–21 (2016).

To that end, section 510 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.

To recover under section 510, a plaintiff must show that the defendant had the specific intent to interfere with the plaintiff's pension benefits. *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 979 (5th Cir. 1993). In *Unida*, the Fifth Circuit held that the following evidence did not raise a genuine issue of fact material to determining whether Levi Strauss had closed its San Antonio plant with the specific intent to violate ERISA:

> (1) evidence that the San Antonio plant was closed to "cut costs"; (2) evidence that Levi Strauss decided to close its San Antonio plant rather than cutting back its Program 807 operations in the Caribbean, a labor market where the company did not incur pension and benefit expenses; (3) evidence that, at the time the San Antonio plant was closed, management was aware that benefit and pension costs were rising steeply on a company-wide basis; and (4) evidence suggesting that the plant closure prevented 369 employees at the San Antonio plant with less than five years of service from becoming "fully vested."

*Id.* at 980.

A plaintiff must also prove that the defendant promised a certain benefit under "an existing, enforceable obligation assumed by the employer." *McGann v. H & H Music Co.*, 946 F.2d 401, 405 (5th Cir. 1991). When a plaintiff fails to produce evidence of a promised benefit, summary judgment is appropriate. *See id.*

## III.    Analysis

### A.    The Motion to Strike

CPChem moves to strike portions of four affidavits that Coleman attached to his response in opposition to summary judgment. (Docket Entry No. 24). For the following reasons, the motion is granted in part and denied in part.

#### 1.    Coleman's Affidavit

Paragraph 1 of Coleman's affidavit states: "I was an employee Chevron Phillips Chemicals [*sic*] and started work at Plant 7 at the Pasadena polyethylene complex two years prior to transferring to Plant 6." (Docket Entry No. 22-2 at ¶ 1). CPChem objects to this paragraph on the

ground that it contradicts Coleman's prior deposition testimony. Coleman testified in his deposition that he was hired as a plant operator at CPChem's plant 7 on November 4, 2019. (Docket Entry No. 19-1 at 8–9). He testified that he transferred to plant 6 around January 21, 2021. (*Id.* at 11–12). Paragraph 1 of Coleman's affidavit therefore contradicts his deposition testimony. Paragraph 1 is stricken under the sham affidavit doctrine.

Paragraph 9 of Coleman's affidavit states: "WAYNE KLINE has been working at Chevron for thirty (30) years. He is the person who actually makes Plant 6 function. He is an essential employee of CHEVRON PHILLIPS CHEMICAL COMPANY and the company will do what he requests." (Docket Entry No. 22-2 at ¶ 9). CPChem objects to this paragraph on the ground that it is a "[c]onclusory and speculative statement not based on personal knowledge." (Docket Entry No. 24 at 3). The court agrees. The paragraph is stricken.

Paragraph 10 of Coleman's affidavit states: "As an employee at Plant 6, my responsibilities were increased to include monitoring reactors where the polyethylene chemicals are manufactured." (Docket Entry No. 22-2 at ¶ 10). CPChem objects to this paragraph on the ground that it contradicts Coleman's prior deposition testimony that Nicole Wright had assigned him to train on the outside reactor at plant 6 because there was a business need for additional reactor-qualified operators. The court is not persuaded that there is a genuine contradiction between paragraph 10 and Coleman's deposition testimony. The objection is overruled.

Paragraph 16 of Coleman's affidavit states: "WAYNE KLINE was a supervisor at Plant 6. He was directly in charge of all of the operators at Plant 6." (Docket Entry No. 22-2 at ¶ 16). CPChem objects to this paragraph on the ground that it is a "[c]onclusory and speculative statement not based on personal knowledge." (Docket Entry No. 24 at 4). The objection is overruled. The record supports concluding that Coleman had personal knowledge of Kline's supervisory role.

Paragraph 18 of Coleman's affidavit states: "To retain employment at Plant 6, I had to satisfy WAYNE KLINE." (Docket Entry No. 22-2 at ¶ 18). CPChem objects to this paragraph on the ground that it is a "[c]onclusory and speculative statement not based on personal knowledge." (Docket Entry No. 24 at 4). The objection is overruled. CPChem's objection appears to be to the accuracy of the statement, which is a matter of the weight to be given the testimony, not of admissibility.

Paragraph 19 of Coleman's affidavit states: "WAYNE KLINE made the following statements directly to me:

[1] I do not believe in Black Lives Matter.

[2] Blacks always try to hide behind civil rights law.

[3] What makes you guys think you are so special?

[4] Why don't you guys go back to your own country?

[5] He wished the Civil War turned out different and you (blacks) would still be in the place you need to be in.

[6] I guess you did not graduate from elementary school.

[7] Did you graduate high school?

[8] Don't believe what you hear (referring to his conviction for a sex crime with a minor).

[9] You are a dumb ass and I am going to get you fired.

(Docket Entry No. 22-2 at ¶ 19).

CPChem objects to this paragraph on the ground that it contradicts Coleman's prior deposition testimony. Specifically, CPChem notes that Coleman did not mention in his deposition statements 3, 5, 8, and 9. (Docket Entry No. 24 at 4). But when asked in the deposition whether "we discussed everything that forms the basis of your race discrimination claim against CP Chem," Coleman replied "[t]o the best of my knowledge." (Docket Entry No. 24-2 at 2).

CPChem's objection has merit.  A plaintiff who testifies in his deposition that he has identified all the statements that form the basis of his discrimination claim cannot, after a summary judgment motion has been filed, add additional statements not previously mentioned.  *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (collecting authority); *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("[A] district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember"). Statements 3, 5, 8, and 9 in paragraph 19 are stricken under the sham affidavit doctrine.

Paragraph 20 of Coleman's affidavit states: "A co-worker suggested I go to WAYNE KLINE'S Facebook page and see what is there.  His Facebook page contained pictures of him standing in front of a Confederate flag."  (Docket Entry No. 22-2 at ¶ 20).  CPChem objects to this paragraph on the ground that it contradicts Coleman's prior deposition testimony.  This objection is meritorious for the same reason as the previous objection.  Paragraph 20 is stricken.

Paragraphs 24, 25, and 27 of Coleman's affidavit state:

24. As a new operator I was supposed to have a trainer/coach to walk me through the plant and teach me how the plant operates.  The coach is then supposed to come back a week later and ask me to show what I have learned.

25. I did not receive this same sort of treatment.  I was not assigned a trainer/coach and no one gave me instructional walkthroughs of the plant.  I was given a plant operations book and told to figure it out for myself.

. . .

27. There is no formal checklist or punch list that is used to conduct a walkthrough of a plant at the Pasadena complex.  Whether a new employee passes or fails a walkthrough is a very subjective matter.

(Docket Entry No. 22-2 at ¶¶ 24–25, 27).

CPChem objects to these paragraphs on the ground that they are "[c]onclusory and self-serving statements that are contrary to the record evidence."  (Docket Entry No. 24 at 4).  The objections are overruled.  Neither the self-serving nature of a summary judgment affidavit, nor its

contradiction of other record evidence, are grounds for exclusion. *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160–01 (5th Cir. 2021) ("Self-serving affidavits . . . may create fact issues even if not supported by the rest of the record," and "may not be discounted on that basis alone.").

Paragraph 30 of Coleman's affidavit states: "The managers and supervisors of all of the plants in the Pasadena complex work in close co-operation.  They do not take action without the knowledge and approval of the other managers."  (Docket Entry No. 22-2 at ¶ 30).  CPChem objects to this paragraph on the ground that it is a "[c]onclusory and speculative statement not based on personal knowledge."  (Docket Entry No. 24 at 4).  The objection is overruled because the record supports the conclusion that Coleman has personal knowledge of how the managers and supervisors in the Pasadena complex work together.

Paragraph 31 of Coleman's affidavit states: "Other employees who were white and worked at the same jobs I did at Plant 6 were KEVIN COCHORAN and KENNY CLARK.  Neither of those employees was required to go through repeated walkthroughs as I was.  Neither of them had my experience.  Those employees did the same jobs I did at Plant 6."  (Docket Entry No. 22-2 at ¶ 31).  CPChem objects to this paragraph on the ground that it is a "[c]onclusory and speculative statement not based on personal knowledge."  (Docket Entry No. 24 at 4).  CPChem notes that Coleman, in his deposition, testified that both Clark and Cochoran had already completed their training and become qualified by the time Coleman started at plant 6.  (*Id.*).  CPChem's objection is sustained.  Paragraph 31 is stricken from the summary judgment record.

Paragraph 32 of Coleman's affidavit states: "Other employees who were younger than me and worked at the same jobs I did at Plant 6 were KEVIN COCHORAN, KENNY CLARK, ARMANDO ALVAREZ, and CHRIS WILLIAMS.  None of those employees was required to go

through repeated walkthroughs as I was.  None of them had my experience." (Docket Entry No. 22-2 at ¶ 32).  CPChem objects to this paragraph, insofar as it relates to Cochoran, Clark, and Williams, on the same ground that it objects to paragraph 31.  The objection is meritorious.  As with Clark and Cochoran, Coleman testified that Williams had completed his training before Coleman began at plant 6.  (Docket Entry No. 19-1 at 39).  CPChem objects to the paragraph as it relates to Alvarez on the ground that "Coleman testified [in his deposition] only that Alvarez received more assistance in his training, but ultimately admitted that he is unware [*sic*] of any employee, including Alvarez, who was not terminated after failing to pass a walkthrough after four attempts." (Docket Entry No. 24 at 5).  Coleman testified that he was working at plant 6 at the time Alvarez was trained.  (Docket Entry No. 19-1 at 39).  The deposition testimony that CPChem cites does not contradict Coleman's affidavit statement as to Alvarez.  The objection is overruled insofar as the paragraph applies to Alvarez.  The paragraph is stricken from the summary judgment record only insofar as it relates to Cochoran, Clark, and Williams.

Paragraph 33 of Coleman's affidavit states: "I was 58 years old when I started working at Plant 6.  I was told by someone that I was too old to work on reactors because by the time I learned everything I would be ready to retire." (Docket Entry No. 22-2 at ¶ 33).  CPChem objects to this paragraph on hearsay grounds.  (Docket Entry No. 24 at 5).  The objection is sustained only insofar as the out-of-court statement is offered to prove that Coleman was too old to work on reactors. *See* Fed. R. Evid. 801(c)(2).  The out-of-court statement may be considered as circumstantial evidence of age discrimination, but its probative value is doubtful because Coleman does not identify the declarant.

2.      **The Other Affidavits**

CPChem objects to the following statements in the affidavits of David Winkelman, Donald

Hall, and Derrick Norris, on the ground that they are not based on personal knowledge:

| Statement | Winkelman Affidavit | Norris Affidavit | Hall Affidavit |
|---|---|---|---|
| "When a new operator comes on board….This process is repeated until the coach thinks the new employee is proficient." | ¶10 | ¶ 7 | ¶ 6 |
| "[s]upervisors are typically very indulgent of new employees passing through the learning process.." | ¶11 | ¶8 | ¶7 |
| "Ronnie Coleman did not receive this same sort of treatment." | ¶12 | ¶9 | ¶8 |
| "The reception of a new employee is a very subjective thing…" | ¶ 13 | ¶ 10 | ¶9 |
| "There is no formal checklist…very subjective matter." | ¶14 | ¶11 | ¶10 |
| "The managers and supervisors of all of the plants work in close cooperators…approval of other managers." | ¶15 | ¶12 | ¶11 |
| "Coleman worked as an operator at Plant 6…I do not know of any incidents…" | N/A | ¶16 | ¶13 |

The record supports the conclusion that the affiants have personal knowledge of the way

training is typically done at CPChem's Pasadena complex.  Winkelman's affidavit states:

- "I have been an employee of Chevron Phillips Chemicals for seventeen (17) years." (Docket Entry No. 22-3 at ¶ 1).

- "I currently work in maintenance for the ethylene plant complex in Pasadena, Texas."  (*Id.* at ¶ 2).

- "In the past, I have worked as an operator in that plant complex."  (*Id.* at ¶ 3).

- "I am very familiar with the practices and procedures of Chevron Phillips Chemical in training new operators."  (Docket Entry No. 22-3 at ¶ 8).

Norris's affidavit states:

- "I was an employee of Chevron Phillips Chemicals for thirty-one (31) years.  I have been retired from Chevron for two and half (2.5) years."  (Docket Entry No. 22-3 at ¶ 1).

15

- "I was a union representative of the United Steel Workers, which is the union that represents operators at the Pasadena polyethylene complex owned by Chevron Phillips Chemical Company LP. I have experience in dealing with the management at the Pasadena complex." (*Id.* at ¶ 2).

- "I am very familiar with the practices and procedures of Chevron Phillips Chemical in training new operators. The training procedures are the same at all of the Plants in the Pasadena complex." (*Id.* at ¶ 6).

Hall's affidavit states:

- "I was an employee of Chevron Phillips Chemicals for many years. I have been retired from Chevron for two (2) years." (Docket Entry No. 22-5 at ¶ 1).

- "I am very familiar with the practices and procedures of Chevron Phillips Chemical in training new operators. The training procedures are the same at all of the Plants in the Pasadena complex." (*Id.* at ¶ 5).

These statements are sufficient to establish that the affiants have personal knowledge of the way training is typically done at CPChem's Pasadena complex. However, the court cannot conclude based on the record evidence that the affiants have personal knowledge of the way Coleman was trained. With respect to this issue, Winkelman's affidavit states: "I personally knew RONNIE COLEMAN when he worked as an operator at Plant 7 and Plant 6." (*Id.* at ¶ 5). Norris's affidavit states: "In my capacity as a union representative, I was familiar with the facts of the conflict between RONNIE COLEMAN and Chevron Phillips Chemical Company LP." (*Id.* at ¶ 3). Hall's affidavit states: "As a former employee at the Pasadena complex owned by Chvron [*sic*] Phillips Chemical Company LP, I was familiar with the facts of the conflict between RONNIE COLEMAN and Chevron Phillips Chemical Company LP." (*Id.* at ¶ 2). It is not enough for the affiants to state that they knew Coleman or were familiar "with the facts of the conflict." To give competent testimony as lay fact witnesses, the plaintiff must establish that the witnesses have personal, rather than second-hand knowledge, of how Coleman was trained. *See* Fed. R. Civ. P. 56(c)(4).

16

Accordingly, the paragraphs of the Winkelman, Hall, and Norris affidavits about how Coleman was trained are stricken from the summary judgment record. But the paragraphs about how training was generally done at CPChem's Pasadena complex are competent evidence.

CPChem also objects to the following paragraphs of Hall's affidavit, on the grounds that "they are speculative, conclusory, lack foundation, and are not based on personal knowledge:

14. RONNIE COLEMAN did do what he was told to do.

15. RONNIE COLEMAN passed all the written examinations administered to him.

16. RONNIE COLEMAN accurately remembered the things I told him regarding the operations of the plant.

17. It appears to me that RONNIE COLEMAN was progressing well in learning the operations at Plat [*sic*] 6.

(Docket Entry No. 22-5 at ¶¶ 14–17).

CPChem also objects to paragraph 18 of Hall's affidavit "because it is based on hearsay and also lacks foundation and is not based on personal knowledge." (Docket Entry No. 24 at 6–7). Paragraph 18 states: "There were two people training at Plant 6 at the time that RONNIE COLEMAN was being trained. The other employee was not treated the same as RONNIE COLEMAN. The supervisor spent time training the other employee but ignored RONNIE COLEMAN." (Docket Entry No. 22-5 at ¶ 18). For the reasons stated above, the record does not allow the conclusion that Hall had personal knowledge of Coleman's performance as a CPChem employee, Coleman's success in training, or how Coleman was treated by supervisors. Paragraphs 14–18 of Hall's affidavit are accordingly stricken from the summary judgment record.

Finally, CPChem objects to Norris's affidavit in its entirety because "Norris was not disclosed as a person with relevant knowledge within the discovery period in compliance with Coleman's discovery obligations and Rule 26 of the Federal Rules of Civil Procedure." (Docket Entry No. 24 at 7) (citing FED. R. CIV. P. 37(c)). Coleman does not dispute that Norris was not

17

disclosed within the discovery period.  Instead, Coleman responds that he supplemented his interrogatory answers to disclose Norris and "the information he possessed . . . as soon as such was made known to plaintiff's counsel."  (Docket Entry No. 28 at 14).  That disclosure did not take place until after CPChem moved for summary judgment.

Rule 37(c) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 26(e) requires a party "who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission" to "supplement or correct its disclosure or response[] in a timely manner if the party learns in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A).

Coleman's argument that he timely supplemented his interrogatory responses fails because it is not supported by an affidavit from his counsel stating when counsel learned that Norris was a potential witness and when counsel disclosed that to opposing counsel.  *See Mission Toxicology, LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 338, 344 (W.D. Tex. 2020) ("Rule 37(c)(1) implicitly places the burden on the party facing sanctions to prove harmlessness or substantial justification.") (quotation marks and quoting reference omitted); *Jefferson v. Hosp. Partners of Am., Inc.*, 2009 WL 8758090, at *14 (S.D. Tex. May 18, 2009), *aff'd sub nom. Jefferson v. Christus St. Joseph Hosp.*, 374 Fed. App'x. 485 (5th Cir. 2010) ("[U]nsupported factual assertions contained in a party's briefs, like opening or closing arguments in trial, are not evidence[.]") (citing

*Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 723 (N.D. Tex. 2006)).  Norris's affidavit, in its entirety, is stricken from the summary judgment record.

In summary, the court rules as follows on the motion to strike:

| Coleman Affidavit | | | |
|---|---|---|---|
| | **Stricken** | **Partially Stricken** | **Denied** |
| Paragraph 1 | X | | |
| Paragraph 9 | X | | |
| Paragraph 10 | | | X |
| Paragraph 16 | | | X |
| Paragraph 18 | | | X |
| Paragraph 19 | X | | |
| Paragraph 20 | X | | |
| Paragraph 24 | | | X |
| Paragraph 25 | | | X |
| Paragraph 27 | | | X |
| Paragraph 30 | | | X |
| Paragraph 31 | X | | |
| Paragraph 32 | | X | |
| Paragraph 33 | | X | |

| Winkelman Affidavit | | |
|---|---|---|
| | **Stricken** | **Denied** |
| Paragraph 10 | | X |
| Paragraph 11 | | X |
| Paragraph 12 | X | |
| Paragraph 13 | | X |
| Paragraph 14 | | X |
| Paragraph 15 | | X |

| Norris Affidavit | | |
|---|---|---|
| | **Stricken** | **Denied** |
| Entire Affidavit | X | |

| Hall Affidavit | | |
|---|---|---|
| | **Stricken** | **Denied** |
| Paragraph 6 | | X |
| Paragraph 7 | | X |
| Paragraph 8 | X | |

| Paragraph 9 | | X |
| Paragraph 10 | | X |
| Paragraph 11 | | X |
| Paragraph 13 | X | |
| Paragraph 14 | X | |
| Paragraph 15 | X | |
| Paragraph 16 | X | |
| Paragraph 17 | X | |
| Paragraph 18 | X | |

### B.       The Title VII Claim

Coleman argues that he has produced direct evidence that CPChem discriminated against him on the basis of race.  (Docket Entry No. 22 at 13).  Coleman relies on Kline's alleged racist statements in combination with Kline's alleged statement that "You"—meaning Coleman—"are a dumb ass and I am going to get you fired."  (*Id.*).

"Direct evidence is rare."  *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (quoting reference omitted and alteration adopted).  The Fifth Circuit has defined "direct evidence" as "evidence which, if believed, proves the fact without inference or presumption."  *Id.* (quoting reference omitted).  Courts in this circuit apply a four-part test to determine whether workplace comments are direct evidence of discrimination:

> To qualify as direct evidence of discrimination, workplace comments must be 1) related to the protected class of persons of which plaintiff is a member; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.

*Id.* (quoting reference omitted and alterations adopted).

The Fifth Circuit recently summarized the cases in which it has found that workplace comments were direct evidence of discrimination:

> [I]n *Portis*, a demoted bank employee alleging sex discrimination in violation of Title VII provided evidence of multiple occasions where her supervisor told her that she 'wouldn't be worth as much as the men would be to the bank' and 'she would be paid less because she was a woman.' We held that no inference was

required to conclude that the employee was treated differently because of her sex, meaning her supervisor's statements constituted direct evidence of discrimination.

There was also direct evidence of discrimination in *Etienne*, where a casino's former employee, an African-American woman, alleged that she was not promoted to a managerial position due to her race in violation of Title VII. We held that statements made 'on several occasions' by the general manager—who was responsible for filling the position—that he did not allow 'dark skin black persons to handle any money at' the casino and that he 'thought the employee was too black to do various tasks at the casino' constituted direct evidence of discrimination.

Direct evidence was also present in our 2005 *Jones* case. There, an African-American applicant wasn't hired for any of a casino's vacant poker dealer positions and sued the owner under Title VII for race discrimination. The applicant presented evidence that the casino's poker room manager—who was responsible for hiring—regularly used racially derogatory language and stated that 'they were not going to hire a black person unless there were extenuating circumstances.' Further, the applicant presented evidence that the same manager told his assistant that 'good old white boys don't want blacks touching their cards in their face' and said to a former employee 'maybe I've been told not to hire too many blacks in the poker room.' The court held that these statements were direct evidence of discrimination.

Our 2006 decision in *Rodriguez* is also instructive. 'This case is one of those rare ADA cases in which we are presented with direct (rather than circumstantial) evidence of discriminatory intent: ConAgra and Ms. Zamora have both admitted that Rodriguez did not get his job because of his allegedly uncontrolled diabetes.' 'In its appellate brief, ConAgra twice concedes (albeit coupled with an irrelevant caveat) that it withdrew Rodriguez's job offer because it regarded him as substantially limited by his diabetes in the major life activity of working.'

*Id.* at 579–80 (alterations adopted).

As explained in Part III.A, the court has stricken from the summary judgment record certain of Kline's alleged statements under the sham affidavit doctrine. The alleged statements from Kline that remain in the record are:

[1] I do not believe in Black Lives Matter.

[2] Blacks always try to hide behind civil rights law.

[3] Why don't you guys go back to your own country?

[4] I guess you did not graduate from elementary school.

[5] Did you graduate high school?

21

(Docket Entry No. 22-2 at ¶ 19).

These statements do not satisfy the four-part test set out in *Clark*. They are not facially "related to the employment decision at issue"—Coleman's termination. Moreover, the statements are too distant from Coleman's firing to be more than nasty stray remarks, as opposed to direct evidence of racial discrimination. *See Yul Chu v. Mississippi State Univ.*, 592 Fed. App'x. 260, 264 (5th Cir. 2014); *Guice v. Therapy Mgmt. Corp.*, 2020 WL 1853052, at *7 (S.D. Miss. Feb. 20, 2020).

Coleman argues, in the alternative, that he has produced circumstantial evidence that CPChem terminated him on the basis of race. (Docket Entry No. 22 at 13). According to Coleman, "[t]he following events and actions are circumstantial evidence of discriminatory intent on the part of the employer":

a. [Coleman] was the only black operator at Plant 6. (Ex. A)

b. Plant 6 is short-handed. The defendant typically would go out of its way to accommodate a new employee. It did not do so for the plaintiff. The plaintiff was exposed to a unique and hostile reception from the moment he transferred into Plant 6. (Ex. A, B, C, D)

c. The plaintiff had prior experience at Plant 7 and he performed all of the functions of a reactor operator while at Plant 6. There were other operators of a different race, younger, and with less experience than plaintiff who were treated more favorably than the plaintiff. (Ex. A, B. C, D)

d. Since the plaintiff worked as a *de facto* reactor operator, the defendant's proffered reason for termination is unbelievable.

e. There is no written procedure for conducting "walkthroughs" and there is fixed or written grading system for measuring an employee's performance on a "walkthrough." (Ex. A, B, C, D)

f. The plaintiff had a satisfactory work history at his prior employment at Plant 7, he passed his written examinations at Plant 6, and no problems with the reactors was attributed to the plaintiff while he worked as a de facto reactor operator at Plant 6. (Ex. A)

g. The plaintiff was replaced by a younger white employee. (Ex. A)

     h. Management criteria for evaluating reactor operators at Plant 6 is completely subjective. (Ex. A, B, C, D)

(*Id.* at 13–14).

     CPChem does not appear to dispute that Coleman has established a *prima facie* case of race discrimination.   Instead, CPChem argues that it has articulated a legitimate, non-discriminatory reason for Coleman's termination: Coleman failed to pass the required walkthrough after four attempts.  (Docket Entry No. 23 at 4).  Coleman attempts to show pretext by relying on evidence that he "worked as a *de facto* reactor operator" and that "[m]anagement criteria for evaluating reactor operators at Plant 6 is completely subjective."  (Docket Entry No. 22 at 13–14).  Coleman states in his affidavit:

     10. As an employee at Plant 6, my responsibilities were increased to include monitoring reactors where the polyethylene chemicals are manufactured.

     . . .

     12. While working at Plant 6, I fulfilled all of the functions of a reactor operator. While working as a reactor operator at Plant 6, there were no losses that were attributed to me.

     13. However, I was not officially certified as an operator.  Without certification, I could not "lock out" a pipe or a valve.  "Locking out" a pipe or a valve is where an operator shuts down a section of pipe or a valve, puts a tag on the equipment, and removes it from the active part of the reactor.  That section of the reactor is then turned over to maintenance who cleans out the section and prepare [*sic*] it to be returned to service.  So, while working at Plant 6, I performed all of the functions of an operator and then had the certified operator come and put tags on the sections I designated.

     14. Any assertion that I am incompetent as an operator is simply not true.  The only thing I lacked was the "certification" as an operator and the only that that meant was that I could not sign the tags put on the equipment.

     . . .

     18. To retain employment at Plant 6, I had to satisfy WAYNE KLINE.

     . . .

27. There is no formal checklist or punch list that is used to conduct a walkthrough of a plant at the Pasadena complex. Whether a new employee passes or fails a walkthrough is a very subjective matter.

28. I was given four (4) walkthrough [*sic*] of Plant 6. The first was in August 2021. It was conducted by Wayne Kline. The second was on September 21, 2021. It was conducted by Howard Williams, the training co-ordinator, but was not completed because he wanted to do it in two parts. The third was on November 15, 2021. It was conducted by a group and lasted three (3) hours. The fourth was on December 15, 2021. It was conducted by Howard Williams. It lasted three (3) hours.

29. I asked Howard Williams how I did on the walkthrough. He told me that I did well. I called Nicole Wright, the plant superintendent, and asked if she had received Howard Williams' report on my walkthrough. She said 'No.' I told Howard Williams that Nicole Wright denied receiving his report on my fourth walkthrough. He became upset and told me that he had sent the report to her.

(Docket Entry No. 22-2 at 2–5).

In essence, Coleman's argument is that he was a competent reactor operator, and that the only reason he was unable to obtain the certification that was required for the position was that his examiners used the "subjective" walkthrough criteria to repeatedly, and unfairly, fail him.

Coleman has not raised a genuine factual dispute material to determining whether CPChem used biased walkthrough evaluations to cover up what was actually a race-based termination decision. Howard Williams, who conducted Coleman's second, third, and fourth walkthroughs, was the same race as Coleman. (Docket Entry No. 19-1 at 14). Kline, the only person who Coleman alleges was racially motivated, participated only in Coleman's first walkthrough. (Docket Entry No. 19-1 at 70). Coleman seems to allege that Howard's evaluation of Coleman's fourth walkthrough was actually positive, but that Wright denied having ever received the report. (Docket Entry No. 22-2 at ¶ 29). The fourth walkthrough evaluation is in the record. (Docket Entry No. 19-2 at 45). It appears to have been filled out by Williams, and rates Coleman as "need[ing] improvement" in several areas. (*Id.*). There is no affidavit from Williams, or any other

evidence, raising a genuine factual dispute material to determining whether the evaluation in the record accurately reflects Williams's evaluation of Coleman's walkthrough.

Summary judgment is appropriate on the Title VII discrimination claim.

### C.    The Age Discrimination Claim

Coleman has established a *prima facie* case of age discrimination.  There is no dispute that he was terminated, was within the protected class, and was replaced by someone younger.  And although Coleman never successfully completed the walkthrough, he alleges that he was prevented from obtaining that qualification for discriminatory reasons.   The age discrimination claim therefore turns on whether Coleman has demonstrated that CPChem's proffered, non-discriminatory reason is pretext for age discrimination.

Coleman has failed to make a showing of pretext.  He relies on evidence that he was "treated substantially differently that [*sic*] younger white co-workers KEVIN COCHORAN and KENNY CLARK," (Docket Entry No. 22 at 16), but as explained in Part III.A, the statements in Coleman's affidavit about how Cochoran and Clark were treated before Coleman transferred to plant 6 are inadmissible.  Coleman's arguments about the subjective evaluation criteria fail for the reasons explained in Part III.B.  That Coleman was replaced by "a younger white or Hispanic operator" is an element of his *prima facie* case but is, on its own, insufficient to establish pretext. Coleman states in his affidavit that "someone"—he does not say who—told him that he "was too old to work on reactors because by the time [he] learned everything [he] would be ready to retire." (Docket Entry No. 22-2 at ¶ 33).  Without evidence tying this statement to a decisionmaker, or even to a specific individual, the statement does not tend to show that age was the true reason for Coleman's termination.

Summary judgment is appropriate on the age discrimination claim.

### D.      The ERISA Claim

Coleman argues that CPChem terminated his employment with the specific intent of denying him "employer-provided medical benefits."  (Docket Entry No. 22 at 18).  In support of this argument, Coleman relies on the temporal proximity between his informing CPChem that he needed a liver transplant and CPChem's decision the next day to terminate Coleman.  (*Id.* at 18–19).

Coleman's reliance on temporal proximity alone is insufficient to raise a genuine issue of fact material to determining whether CPChem terminated Coleman with the specific intent of violating ERISA.  *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) ("[T]emporal proximity alone is insufficient to prove but for causation.").  *Unida*, 986 F.2d 970, discussed in Part II.E, held that the plaintiff failed to raise an issue of fact as to specific intent on much stronger evidence than Coleman presents here.  Moreover, Coleman has not pointed to evidence of "an existing, enforceable obligation assumed by the employer."  *McGann*, 946 F.2d at 405.

Summary judgment is appropriate as to Coleman's ERISA claim.

## IV.    Conclusion

The motion for summary judgment is granted.  (Docket Entry No. 19).  Final judgment is entered by separate order.


SIGNED on February 6, 2024, at Houston, Texas.


_____
                    Lee H. Rosenthal
                 United States District Judge